UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JOHN MILES, SR.,                              CIVIL NO. 04-4072 (DWF/JSM)

     Plaintiff,

v.

SUE DOSAL, et al.,

     Defendants.

---

ROBIN Y. PERKINS,                            CIVIL NO. 04-4111 (DWF/JSM)

     Plaintiff,

v.

SUE DOSAL, et al.,

     Defendants.

---

ARDELLA MCKENZIE,                            CIVIL NO. 04-4133 (DWF/JSM)

     Plaintiff,

v.

SUE DOSAL, et al.,

     Defendants.

---

## REPORT AND RECOMMENDATION

---

The above matter came before the undersigned United States Magistrate

Judge upon plaintiff John Miles, Sr.'s Motion for Summary Judgment [Docket No.

16], plaintiff Robin Perkins's Motion for Summary Judgment [Docket No. 18], plaintiff Ardella Mckenzie's Motion for Summary Judgment [Docket No. 19], and defendants' Motions for Summary Judgment [Docket Nos. 38, 32, and 29].

Plaintiff John Miles, Sr. appeared at the hearing pro se; John Garry appeared at the hearing on behalf of defendants. Plaintiffs Robin Perkins and Ardella Mckenzie were not present and nobody appeared on their behalf.[1]

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c). For the reasons discussed below, **IT IS RECOMMENDED THAT**:

1.     Plaintiff John Miles, Sr.'s (Civil No. 04-4072) Motion for Summary Judgment [Docket No. 16] be DENIED.

2.     Defendants' (Civil No. 04-4072) Motion for Summary Judgment [Docket No. 38] be GRANTED.

3.     Plaintiff Robin Perkins's (Civil No. 04-4111) Motion for Summary Judgment [Docket No. 18] be DENIED.

4.     Defendants' (Civil No. 04-4111) Motion for Summary Judgment [Docket No. 32] be GRANTED.

5.     Plaintiff Ardella Mckenzie's (Civil No. 04-4133) Motion for Summary Judgment [Docket No. 19] be DENIED.

6.     Defendants' (Civil No. 04-4133) Motion for Summary Judgment [Docket No. 29] be GRANTED.

---

[1]     Neither plaintiffs Perkins nor Mckenzie responded to defendants' motion for summary judgment.

7.      Plaintiffs' suits be DISMISSED WITH PREJUDICE.

## I.      PROCEDURAL AND FACTUAL BACKGROUND

### A.      Procedural Background

Plaintiffs John Miles, Sr., Robin Y. Perkins, and Ardella Mckenzie (collectively "plaintiffs"), are African-American residents of Hennepin County. See Compls., Section IV, ¶ 1.  Plaintiffs each brought separate actions under 42 U.S.C. § 1983 claiming that the use of the standard Minnesota juror qualification questionnaire for both grand juries and petit juries in the Minnesota Fourth Judicial District (Hennepin County District Court) violates their equal protection rights as potential jurors because it asks potential jurors to identify their race. See Compls., Section IV, ¶ 5.  On October 28, 2004, the Honorable Donovan W. Frank issued an Order consolidating the actions and ordering that all pretrial proceedings, including dispositive motions, be conducted and heard jointly. [Docket No. 13]. [2]

### B.      Facts Presented by Plaintiffs Bearing on Motions

In November 2004, all three plaintiffs filed motions for summary judgment, contending that there was no genuine issue as to any material fact, and that they were entitled to judgment as a matter of law.  See Notice of Motion for Summary Judgment, Miles (Case No. 04-4072) [Docket Nos. 16, 17], Perkins (Case No. 04-4111) [Docket No. 18], Mckenzie (Case No. 04-4133) [Docket No. 19]. [3]  In

---

[2]      The Complaints in all three actions are identical, except for the name of each plaintiff.

[3]      Notwithstanding plaintiffs' position that the case was ripe for disposition by summary judgment motion, plaintiff Miles  filed "Plaintiff's Motion for Discovery Compliance" (Civil No. 04-4072) [Docket No. 47] on February 2, 2005, shortly

support of their motions, each plaintiff submitted a declaration, which attached certain documents.  Plaintiff Miles attached the Qualification Questionnaire for Hennepin County Grand Jury Service and the Qualification Questionnaire for Petit Jury Service (App. A), the Fourth Judicial District Jury Administration Plan (Ex. D).  Plaintiff Perkins attached the Fourth Judicial District Jury Administration Plan (Ex. D), Defendants' Answer, Information for Grand Jurors, and the Qualification Questionnaire for Hennepin County Grand Jury Service and the Qualification Questionnaire for Petit Jury Service (App. A).  Plaintiff Mckenzie attached the Qualification Questionnaire for Petit Jury Service (Ex. A) and documents appointing Mwati McKenzie to act as her Power of Attorney.

On July 7, 2005, plaintiff Miles filed a "Reply to Defendants Motion Because They Fail to Establish as a Matter of Law that the Plaintiff(s) Have Not Shown that the Juror Selection Process in the Fourth Judicial District Violates the Equal Protection Clause" ("July 7, 2005 Reply")[4] [Docket No. 58], which asserted that African-Americans have been substantially underrepresented in grand jury pools from 1968 through 1994, and that the second stage of the jury selection process is susceptible of abuse.  Plaintiff also attached two documents that he argued constituted prima facie evidence that African-Americans had been underrepresented in grand jury pools during this time period.  The first document,

_____

before the hearing on the parties' cross-motions for summary judgment, and requested that the Court delay its decision on the motions until the information sought by his discovery motion had been produced.  That request is addressed in n.11, supra.

[4]    This memorandum and attachments were filed without request to or permission of the Court.

entitled "Grand Jury Pool Racial Composition," (referenced as Ex. B in Miles' Reply), states that blacks made up 3.84% of the grand juries for the period of March 1968 through November 1994, and that for the period of July 1991 through November 1994, blacks made up 3.56% of the grand juries (9 of 253).[5] The second document, entitled "Hennepin County Grand Jury Composition," (referenced as Ex. A in Miles' Reply), states that blacks made up 3.89% of the grand juries for the period of March 1968 through March 1991.[6]

### C.   Facts Presented by Plaintiffs Bearing on Motions

On December 29, 2004, defendants filed their own motion for summary judgment.  In support of their motion, defendants submitted the Affidavit of Lynn Lahd[7] ("Lahd Aff."), which describes the juror selection process used in the Fourth Judicial District and the data maintained by the District's Jury Division for the racial composition of petit jury pools and grand juries in the District.  A summary of Lahd's Affidavit is set forth in Section B. below.

### 1.   The Genesis of the Jury Selection Plan

The process for juror selection in the Fourth Judicial District is set forth in the Fourth Judicial District Jury Administration Plan.  Lahd. Aff. ¶ 2, Ex. A.  The Plan is required by the Jury Management Rules promulgated by the Minnesota

---

[5]     The source of this document is not identified on the document or by Miles. In addition, the document does not state for which court system it applies.

[6]     The source of this document is identified as the Hennepin County District Court Administration April 1991.

[7]     Lahd has been the Jury Division Supervisor for the Fourth Judicial District since 1998.   Lahd Aff. ¶ 1.   As Jury Division Supervisor, she manages, supervises and coordinates the juror selection process in the Fourth Judicial District and the budget and court staff of the Jury Division.  Id.

Supreme Court.  <u>See</u> Minn. Gen. R. Prac. 801-814.  The Plan has had one substantive change since 1998—the disqualification for prior jury service was changed from four years to two years.  Lahd. Aff. ¶ 2.  The Fourth Judicial District conducts the process of summoning persons for petit or grand jury service, determining their qualification for jury service, deciding their requests for excusal from or deferral of jury service, and forming the petit and grand jury panels in accordance with the provisions of the Plan and the Jury Management Rules.  <u>Id</u>..

## 2.    The Jury Qualification Questionnaire

The juror qualification questionnaire used in the Fourth Judicial District is the standard Minnesota juror qualification questionnaire used in each state judicial district in Minnesota, and is required by Minn. Gen. R. Prac. 807(d).[8] Lahd. Aff. ¶¶ 3, 4.  The items on the petit and grand jury qualifications

---

[8]    Rule 807(d) states that the questionnaire must request information essential for, among other items, providing basic background information including:

(1) determining whether a person meets the criteria for eligibility;

(2) determining whether there exists a mental or physical disability which would prevent the person from rendering satisfactory jury service;

(3) providing basic background information including age, race, gender, occupation, educational level, address, marital status, prior jury service within the past four years, occupation of spouse, and the age(s) of any children; and

(4) efficiently managing the jury system.

Minn. Gen. R. Prac., Rule 807(d).

questionnaires are identical and request or require the same information.  Lahd Aff. ¶ 3, Exs. B, C.

Since at least 1998, the juror qualification questionnaire has requested prospective jurors to identify their race.  Lahd Aff. ¶ 4.  The race identification item is in Section B of the questionnaire, which is used to collect a variety of demographic information (e.g. marital status, annual family income, gender, education, ages of children, occupation of potential juror and spouse).  Lahd Aff. Exs. B, C.  According to Lahd, unlike the juror qualification questionnaire that is used in the United States District Court for the District of Minnesota, which requires a potential juror to identify his or her race (Lahd Aff. ¶ 6, Ex. D), completion of the race question on the Minnesota questionnaire is voluntary.[9] Lahd Aff. ¶ 5.  Further, the prospective jurors' race is used only for monitoring the representativeness and inclusiveness of jury panels, to check for discrimination,

---

[9]    Both questionnaires have two sections—Section A and Section B.  Right above Section A, the following language appears:

> Court Rules require that we ask the following questions A) to determine your qualifications for jury duty and B) to ensure efficient management of our jury system.  Minnesota Statute § 593.40, Subd 4. states that anyone failing to return a jury questionnaire pursuant to the Court's order without good cause is guilty of a misdemeanor.

Under Section B, for the race component of the questionnaire, the following language appears:

> Mark one or more races to indicate what race you consider yourself to be.
>
> ❑   American Indian or Alaska Native
> ❑   Asian
> ❑   Black or African American
> ❑   Native Hawaiian or other Pacific Islander
> ❑   White
> ❑   Some other race

Nowhere in the questionnaire is the potential juror told that he or she need not answer any of the items under Section B.

and in the event a party to a case makes a legal challenge to the petit or grand jury in the party's case.  Id.  A prospective juror is not disqualified from jury service if that person does not identify his or her race.  Id.  In such an event, when the potential juror reports for duty, Lahd explains to the person why the information is requested.  If the person still declines to provide the information, the person is not disqualified from jury service.  Id.

### 3. Selection of Prospective Jurors for Petit Juries and Grand Juries

The Fourth Judicial District draws its source list of prospective jurors from the Minnesota voter registration list, the Minnesota drivers' license list, and the Minnesota identification list.  Lahd Aff. ¶ 7.  The lists are merged to create one juror source list and the duplicate names are removed.  Id.  This merged information does not include the race of any persons.  Second Affidavit of Lynn Lahd ("Second Lahd Aff."), ¶ 4.

Each year approximately 40,000 names are randomly selected by computer[10] from the source list to make the master juror list for that year.  Lahd Aff. ¶ 7.

### 4. Selection of Petit Jurors

Each week, prospective jurors for petit jury service are randomly selected by computer from the master list and are mailed the summons and qualification questionnaire for petit jury service.  Id.  Lahd determines the number of people to

---

[10]    The Fourth Judicial District uses "Jury Plus, Next Generation" software for the jury selection process done by computer.  The software uses the Marsaglia random number generator for those parts of the process that require the random selection or numbering of names.  Lahd Aff. ¶ 8, Ex. E.

be selected for a particular upcoming week based on her analysis of the need for petit jurors.  Lahd, Aff. ¶ 7.

A summoned prospective petit juror is disqualified by the Jury Division if the response to the items in Section A of the juror qualification questionnaire indicate that the person does not meet one of the qualifications for jury service in the Jury Management Rules.  See Minn. Gen. R. Prac. 808;[11] Lahd Aff. ¶ 9. Race is not a basis for disqualification.

Separate from the rules bearing on disqualification, pursuant to Minn. Gen. R. Prac. 810(b) and part 11 of the Fourth Judicial District Jury Administration Plan, the Jury Division excuses a summoned prospective petit juror from jury service only if the person requests to be excused and the person's

---

[11]     According to Minn. Gen. R. Prac. 808, to be qualified to serve as a juror, a prospective must be:

> (1) A citizen of the United States.
> (2) At least 18 years old.
> (3) A resident of the county.
> (4) Able to communicate in the English language.
> (5) Be physically and mentally capable of rendering satisfactory jury service. A person claiming disability may be required to submit a physician's certificate as to the disability, and the Judge may inquire of the certifying physician. A prospective qualified juror who is 70 years of age or older, who requests to be excused from jury service shall be automatically excused from service without having to submit evidence of an inability to serve.
> (6) A person who has had their civil rights restored if they have been convicted of a felony.
> (7) A person who has not served as a state or federal grand or petit juror in the past two years.
>
> (c) A judge, serving in the judicial branch of the government, is disqualified from jury service.

Minn. Gen. R. Prac., Rule 808(b), (c).

ability to receive and evaluate information is so impaired as to make it impossible for the person to act as a juror or the person has a continuing, extreme hardship situation that would represent an obvious inability to serve as a juror.  Lahd Aff. ¶ 9.  Most summoned prospective petit jurors request excusal from jury service without ever returning a juror qualification questionnaire, and therefore, the Jury Division does not have any information on the requesting person's race.  Id. Summoned prospective petit jurors are automatically granted one deferral of service for up to six months if they so request and a second deferral of petit jury service to a more convenient date, if another deferral is requested in writing and is reasonable.  Id.

The petit jury pool for any given week consists of summoned prospective petit jurors who returned a complete qualification questionnaire, reported for jury service, have not been disqualified or excused from service, and whose service has not been deferred.  Lahd Aff. ¶ 10.  From this pool, a designated number of names are randomly selected by computer for the jury panel in a case.  Id.  The number of names selected for a jury panel depends on the type of case, with murder trials having a large designated panel.  Id.

Once the jury panel is sent to the presiding judge in the case, the judge controls the process for selection of the jurors from the panel for the jury trial, including voir dire and ruling on peremptory challenges and challenges for cause made as to particular jurors on the panel.  Lahd Aff. ¶ 10.  The Jury Division provides the presiding judge and the attorneys for the parties in the case a profile of each of the jurors on the panel consisting of demographic information

(including race) taken from Section B of the qualification questionnaires submitted by the panel jurors.  Id.

### 7.    Selection of Grand Jurors

Three times per year, 125 prospective grand jurors are randomly selected by computer from the master list and are mailed the summons and qualification questionnaire for grand jury service.  Lahd Aff. ¶ 7.

For summoned prospective grand jurors, qualification determinations for service and decisions on requests for excusal are made on the same grounds as those made for summoned prospective petit jurors.  Lahd Aff. ¶ 11.  A summoned prospective grand juror is not permitted any deferrals of grand jury service, and is excused from service only if the person requests to be excused and satisfies the impairment or hardship grounds for excusal set forth in Minn. Gen. R. Prac. 810(b).  Id.

When the summons for grand jury service is mailed to the 125 prospective grand jurors, the computer system randomly assigns each of the prospective jurors a number from one to 125.  Lahd Aff. ¶ 12.  Then the Jury Division goes down the list of 125 names, starting at the top, and identifies the first 30 people on the list who have not been disqualified or excused from service.  Id. ¶ 12.  The Jury Division sends these thirty people a letter informing them that they must report for grand jury service on the assigned date.  Id.  If some of the thirty people have not yet returned a completed juror qualification questionnaire, the Jury Division will also mail this reporting letter to the next few persons on the list who have not been disqualified or excused, in order to ensure that at least thirty

people who report will have completed the questionnaire.  Id.  The remaining people on the list are the "overcall" and are sent a letter by the Jury Division informing them that they do not need to report for service.  Id.  Of the people who report for grand jury service, the first twenty-three assigned numbers are sworn in as grand jurors and the remaining people are sworn in as alternates and released from service.  Id.

### 8.    Data Regarding Petit Jury Pools

The Jury Division has collected data for petit jury pools from 1994 through 2004 and for grand juries from 2002 through 2004.[12]  Lahd Aff. ¶ 13, Exs. F-H.  In this regard, the "Petit Jury Pool Racial Composition Overview, 1994-2003," which was prepared by the Fourth Judicial District Jury Division in 2004, lists the racial composition of the aggregate of the petit jury pools for each year from 1994 through 2003 and provides the United States Census percentage of the population of African-Americans who are eighteen or older and live in the Fourth Judicial District.  Lahd Aff. ¶ 14.  The 1990 census percentage of the population age of African-Americans, eighteen or older, living in the Fourth Judicial District was 4.6%.  Id.  The 2000 census percentage of the population of African-Americans, eighteen or older, living in the Fourth Judicial District was 7.4%; however, this figure also includes African-American residents who are not qualified for jury service.  Id.

---

[12]    The Jury Division does not have data on the racial composition of petit jury pools in the Fourth Judicial District for years before 1994 or data on the racial composition of grand juries in the Fourth Judicial District for years before 2002 due to the records retention schedule established for the Minnesota state district courts.  Lahd Aff. ¶13; 2d Lahd Aff. ¶5.

The petit jury pool in the Fourth Judicial District that was African-American increased from 3.8% in 1994 to 5.2% in 2000.  Lahd Aff. ¶ 15, Exs. F-G.  From January 2000 to December 2004, the percentage of the Fourth Judicial District petit jury pool that was African-American totaled 5.7% (2319 African-Americans out of 40,410 persons in the petit jury pool).  Lahd Aff. ¶ 15.  From January through December 2004, African-Americans have comprised 7.1% of the Fourth Judicial District petit jury pool.  Id.

### 9.   Data Regarding Grand Jury Pools

Data regarding the racial composition of the grand juries in the Fourth Judicial District for the years 2002 through 2004, shows the racial composition of each of the nine grand juries that have been impaneled in the Fourth Judicial District in the last three years.  Lahd Aff. ¶ 16.  African-Americans comprised 9.2% of the grand jurors in the Fourth Judicial District (19 of the 207 grand jurors).  Id.

## II.   STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celeotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999). "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a

whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327. "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, at *4-5 (D. Minn. 2003) (citations omitted). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

## III.   **DISCUSSION**

Plaintiffs challenge the standard Minnesota juror qualification questionnaire on grounds that requiring summoned prospective jurors to identify their race violates the Equal Protection Clause because it causes African-

Americans to be systematically excluded from jury service in the Fourth Judicial District based on their race. Compls. Section IV, ¶ 5. Plaintiffs request relief in the form of an injunction and a declaratory judgment. Compls. "Relief" A-B.[13]

Defendants claim that plaintiffs' suit should be dismissed on summary judgment because plaintiffs cannot make out a prima facie case that the juror selection process in the Fourth Judicial District violates the Equal Protection Clause.[14]

The United States Supreme Court "has long recognized that 'it is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury . . . from which all persons of his race or color have, solely because of that race or color, been excluded by the State . . .'" Castaneda v. Partida, 430 U.S. 482, 492 (1977) (citations omitted). While "earlier cases involved absolute exclusion of an identifiable group, later cases established the principle that substantial underrepresentation of the group constitutes a constitutional violation as well, if it results from purposeful

---

[13]   On July 7, 2005, plaintiffs filed a motion to amend their Complaints to add claims for compensatory and punitive damages. Miles (Civil No. 04-4072) [Docket No. 56], Perkins (Civil No. 04-4111) [Docket No. 47], and Mckenzie (Civil No. 04-4133) [Docket No. 45]. Those motions will be addressed in a separate Order issued by this Court.

[14]   Defendants do not challenge plaintiffs' standing to bring this suit as potential jurors, citing Carter v. Jury Comm'n, 396 U.S. 320, 329-30, 90 S.Ct. 518, 523-24 (1970). The Court notes that in Carter, the plaintiffs alleged that they "were fully qualified to serve as jurors and desired to serve, but had never been summoned for jury service." Id. at 322, at 519. In this case, plaintiffs have not alleged that they are fully qualified to serve as jurors or that they had never been summoned for jury service. Nevertheless, the Court will assume for the purpose of its decision that both conditions are true.

discrimination."   Id. at 492.   Thus, in order to show that an equal protection violation has occurred in the context of jury selections, plaintiffs must show that the procedure employed by the State resulted in substantial underrepresentation of their race.   Id.   To establish a prima facie equal protection violation, plaintiffs must present the following:

> (1) blacks are "a recognizable, distinct class, singled out for different treatment;" (2) blacks were substantially underrepresented in jury pools over a significant period of time; and (3) the jury-selection process is "susceptible of abuse or is not racially neutral."

Floyd v. Garrison, 996 F.2d 947, 949 (8th Cir. 1993) (quoting Castaneda v. Partida, 430 U.S. 482, 494 (1977).   See also United States v. Horne, 4 F.3d 579, 588 (8th Cir. 1993) ("In order to make out a prima facie case of an equal protection violation in the composition of a jury, a defendant must show that an identifiable, distinct class has been substantially under-represented in the source from which jurors have been drawn over a significant period of time.")   Once plaintiffs have made out a prima facie case of discriminatory purpose, the burden then shifts to the State to rebut that case.   Castaneda, 430 U.S. at 495; Alexander v. Louisiana, 405 U.S. 625, 632 (1972) ("Once a prima facie case of invidious discrimination is established, the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result.").

It is undisputed that plaintiffs have met the first element of the prima facie case—that African-Americans "are members of a group recognizable as a

distinct class capable of being singled out for different treatment under the laws."

Rose v. Mitchell, 443 U.S. 545, 565 (1979).  However, according to defendants,

because plaintiffs have failed to meet the second and third prongs of a prima

facie case, summary judgment must be granted on plaintiffs' claims.  Plaintiffs

disagree.  They contend that they have met their burden of establishing all three

elements of the prima facie case, and that therefore, summary judgment should

be entered in their favor.

Based on the undisputed evidence presented by defendants,[15] this Court

concludes that plaintiffs have failed as a matter of law to meet the second or third

_____

[15]     Both sides have represented to this Court that this dispute is ripe for summary judgment because there are no genuine issues of material fact.  See e.g. Plaintiff's Notice of Motion for Summary Judgment, Miles (Case No. 04-4072) [Docket Nos. 16, 17], Perkins (Case No. 04-4111) [Docket No. 18], Mckenzie (Case No. 04-4133) [Docket No. 19]; Plaintiff's Response to Motion for Summary Judgment and Memorandum of Law from Defendant's [sic], at 2 ("Plaintiff's move this court to dismiss the defendant's Motion and Memorandum of Law for Summary Judgment on grounds that there is no genuine issue as to any material fact(s) or legal basis."); Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment, at 11.  Nevertheless, despite bringing their own motion for summary judgment, and taking the position that there were no disputes of material fact, plaintiff Miles filed a Motion for Discovery Compliance (Civil No. 04-4072) [Docket No. 47] on February 2, 2005, and served a Request for Production of Documents on defendants on February 11, 2005, four days before the hearing on the motions for summary judgment.  (This discovery was attached to a document entitled Plaintiff's Motion to Order Defendant's [sic] to Comply with Discovery.)  Hearing Transcript, at 5-7.  In Miles' Motion for Discovery Compliance, he sought an order from the Court requiring defendants to provide all pre-discovery disclosures required by Rule 26(a)(1).  Specifically, he sought production of all (1) official and administrative data showing the total number of grand jury bodies drawn to serve within Hennepin County from 1989 to 2003, and (2) all official administrative governmental data showing the racial composition of all grand jury bodies drawn to serve and/or having served within Hennepin County from 1989 to 2003.  Miles also asked that this Court defer ruling on the summary judgment motions brought by the parties, until defendants had produced the requested information.

elements of a prima facie case for an equal protection claim asserting systematic

racial exclusion from jury service.

---

With respect to Miles' document requests, Miles sought: (1) copies of any business, financial, accounting or archive records of or for the Hennepin County District Court which specifically and exclusively showed the names and addresses (particularized identifying data) of each grand juror, or alternate, that received compensation during each legally prescribed term of grand jury service for the years 1989 through 2001; (2) copies of any plan or policy which showed (a) the procedure for keeping records, (b) the entire process governing Hennepin County's juror compensation, (c) the procedure for grand juror compensation; (3) copies of any schedules for compensation payment to Hennepin County grand jurors; (4) copies of a policy which showed how Hennepin County District Court determines and distinguishes the compensation to its grand jurors and petit jurors; (5) the name of the particular office and person who pays compensation and keeps records of payment; (6) a statement by the Hennepin County District Court describing the method used to account for, keep track of, and ensure compensation to its grand jurors; (7) copies of any lists, documents, or reports on file within the Hennepin County District Court which showed the names and addresses of grand jurors, or alternates, authorized to be compensated from 1989 through 2001; and (8) copies of any statutes or policies dealing with and governing the compensation of Hennepin County grand jurors.

Defendants responded to Miles' discovery motion and request for production of documents by stating that they do not have grand jury data sought by Miles prior to 2002, and that they had produced all information that existed for both grand jury and petit jury pools. See Defendants' Memorandum of Law in Opposition to Plaintiff Miles' Motions for Discovery Compliance, at 3-4. Further, defendants argued that even if the requested information existed from some other source, there is no basis for delaying a decision on the cross-motions for summary judgment. This is because information regarding jury pool composition prior to 2002 is not relevant to the second element of plaintiffs' equal protection claim, and even it was relevant to that element and showed a substantial underrepresentation of African-Americans, plaintiffs still have not shown that the jury-selection process is susceptible of abuse or is not racially neutral. Id., at 5. This Court agrees. Because the information sought by Miles, even if it existed, cannot change the outcome of the parties cross-summary judgment motions, this Court will not delay its ruling on the motions.

A.    **African-Americans are not Substantially Underrepresented on Grand Juries or Petit Jury Pools in the Fourth Judicial District of Minnesota**

The second element of the prima facie case for an equal protection claim alleging systematic racial exclusion from jury service requires plaintiffs to show that African-Americans were substantially underrepresented in petit and grand jury pools over a significant period of time.  This "degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors [and petit jurors], over a significant period of time."  Castaneda, 430 U.S. at 494.

Plaintiffs allege that African-Americans were underrepresented on grand juries in the Fourth Judicial District in the late 1980s and early 1990s.  Plaintiffs also seek relief as to the selection process for petit jury pools in the Fourth Judicial District, although their Complaints do not allege that African-Americans are substantially underrepresented on petit jury pools in the Fourth Judicial District.  See Compls. Section IV, ¶ 6, "Relief" ¶ A.2.  The only "evidence"[16] that plaintiffs submitted in support of their claims were the two documents attached to plaintiff Miles belated (and unauthorized) July 7, 2005 Reply.  The first document, entitled "Grand Jury Pool Racial Composition," states that blacks made up 3.84% of the grand juries for the period of March 1968 through November 1994, and that for the period of July 1991 through November 1994, blacks made up 3.56%

---

[16]    Given that neither document was the subject of a sworn affidavit, and as discussed in note 5, supra, as to the first document, the Court was not provided with any information regarding the court system to which it applied or who prepared the document, the Court concludes that neither document constitutes admissible evidence upon which it can rely in connection with these cross-motions for summary judgment.

of the grand juries (9 of 253).  The second document, entitled "Hennepin County Grand Jury Composition," states that blacks made up 3.89% of the grand juries for the period of March 1968 through March 1991.  From these statistics, Miles argued that African-Americans have been substantially underrepresented in grand jury pools from March 1968 through November 1994.  July 7, 2005 Repy, at 2.  However, Miles submitted no evidence of the total population called to serve as grand jurors during the period of 1968-1994 to perform the comparison.  See Castaneda, 430 U.S. at 494.  Further, plaintiffs submitted no evidence in support of their equal protection claim with respect to petit juries, and no evidence of the composition of grand juries after 1994.

In support of their motion for summary judgment, defendants argued that plaintiffs cannot establish that African-Americans have been substantially underrepresented on grand juries or petit jury pools in the Fourth Judicial District over a significant recent period of time, because the data does not show an underrepresentation.   In fact, as to grand juries, the data presented by defendants shows overrepresentation of African-Americans—the 2000 census percentage of African-Americans age eighteen and older in the Fourth Judicial District was 7.4% (including African-American residents who are not qualified for jury service), while from 2002 through 2004, African-Americans comprised 9.2% of the grand jurors in the Fourth Judicial District.

As to petit juries, defendants assert that the data does not show a substantial underrepresentation of African-Americans in the Fourth Judicial District.   In this regard, defendants state that over the five-year period from

January 2000 to December 2004, African-Americans have comprised 5.7% of the petit jury pool in the Fourth Judicial District, compared to the 2000 census, which showed that African-Americans comprised 7.4% of the persons age eighteen and older in the Fourth Judicial District (including African-American residents not qualified for jury service).[17]   Lahd Aff. ¶ 15, Ex. G.   Therefore, defendants contend that the underrepresentation of African-Americans on the petit jury pools in the Fourth Judicial District, at most, has been 1.7% over the last five years. Defendants argue that a 1.7% disparity, does not establish that African-Americans are underrepresented on petit jury pools.[18]

Several cases have addressed the issue of underrepresentation on petit jury pools.  See Swain v. Alabama, 380 U.S. 202, 208-09 (1965) (overruled on other grounds) ("We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%"); Horne, 4 F.3d at 588 (8th Cir. 1993) (finding "the deviation between the percentage of African-Americans in the community [(2.9%)] and the percentage of African Americans in the venire [(1.4%)]—only 1.5%—was not substantial."); Floyd, 996 F.2d at 949-50 (finding that an underrepresentation of African-Americans was not substantial where,

---

[17]    From January to December of 2004, African-Americans comprised 7.1% of the Fourth Judicial District petit jury pool.  Lahd Aff. ¶ 15, Ex. G.

[18]    Defendants also supplied data for the period of 1994 to 1999 for petit jury pools, and the 1990 United States Census percentage of the population, age eighteen or older, in the Fourth Judicial District.  Lahd, Aff., Ex. F.  This data showed that African-Americans made up between 3.8% to 5% of the petit jury pools for the period 1994-1999, and that in 1990, African Americans made up 4.6% of the population of the Fourth Judicial District.  Lahd Aff. ¶ 14, Ex. F.

over a thirteen month period, 10.335% of the jurors called were African-American, but 13.8% of the population was African-American); Singleton v. A.L. Lockhart, 871 F. 2d 1395, 1398 (8th Cir. 1989) (finding that a 3.6% discrepancy between the percentage of blacks in the total population and the percentage of blacks on the venires was "statistically fair and reasonable"); United States v. Clifford, 640 F.2d 150, 155-56 (8th Cir. 1981) (finding that appellant failed to establish a prima facie case of underrepresentation where Native-Americans comprised 15.6% of the population in the judicial district and 8.4% of the petit jurors over twenty-seven months, creating a disparity of 7.2%); Murrah v. State of Ark., 532 F.2d 105, 109 (8th Cir. 1976) (adopting the 10% test of Swain if the disparity proceeds from objective criteria, i.e., age, educational attainment, registration to vote, etc., "[b]ut if the disparity proceeds from the application of subjective tests, under which there is wide opportunity for intentional racial discrimination, the tolerable disparity is diminished."). [19]

---

[19]    While some of the cases cited are Sixth Amendment cases (Singleton and Clifford), and not equal protection cases, the holdings are still applicable given the similarity of the second element of the prima facie case for both Sixth Amendment and equal protection cases.  Compare Duren v. Missouri, 439 U.S. 357, 364 (1979) (describing the second element of a prima facie case of violation of the Sixth Amendment as "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community") with Castaneda, 430 U.S. 482 (describing the second element of a equal protection violation as "the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time").  See also United States v. Esquivel, 88 F.3d 722, 725 (9th Cir. 1996) (comparing the elements of a prima facie case of a Sixth Amendment violation and equal protection violation).

In this case, for grand jury pools for the period of 2002 through 2004, African-Americans were overrepresented—9.2% compared to 7.4% of population of African-Americans, age 18 and over, in the Fourth Judicial District for the census year 2000.  As to the period of 1991 through 1994, even if the Court were to consider the data provided by plaintiffs for this period (see n.16, supra)—3.56% compared to 4.6% of the African-American population of the Fourth Judicial District for 1990—a disparity of approximately 1% does not show underrepresentation.[20]

Similarly, based on the undisputed evidence presented to this Court, the disparity between the percentage of African-Americans in the community and the percentage of African-Americans in the petit jury pools does not constitute substantial underrepresentation for any period of time.  For the period of 2000-2004, the difference between the percentage of African-Americans in the Fourth Judicial District (7.4%) and the percentage of African Americans in the petit jury pools (5.7%) was 1.7%.  For the period 1994-1999, African-Americans made up between 3.8% to 5% of the petit jury pools compared to 4.6% of African-Americans residing in the Fourth Judicial District in 1990.  According to precedent, this underrepresentation is not substantial.

In sum, regardless of the period of time examined, based on the undisputed evidence before this Court, plaintiffs cannot establish the second

---

[20]     To the extent that plaintiffs suggest that African-Americans were substantially underrepresented in the grand jury pool in Hennepin County District Court for the period of 1968-1989 based on the two exhibits attached to their July 7, 2005 Reply, even if this period was relevant, this Court cannot evaluate their contention because no census data was presented for the years 1960, 1970 or 1980 to allow the Court to perform the comparison.

element of an equal protection claim of systematic racial exclusion from jury service.   Therefore, this Court recommends that defendants' motions for summary judgment be granted, and that plaintiffs' motion for summary judgment be denied.

### B.   The Juror Selection Process in the Fourth Judicial District is Race Neutral and not Susceptible of Abuse

Even had this Court concluded that plaintiffs had made a prima facie showing of the second element of their equal protection claim, summary judgment in defendants' favor would still be warranted based on the evidence presented by defendants (and plaintiffs' failure to present any contrary evidence) that the juror selection process in the Fourth Judicial District is race neutral and is not susceptible to abuse.

To meet the third element of an equal protection claim of systematic racial exclusion from jury service, plaintiffs must establish that the jury-selection process is susceptible of abuse or is not racially neutral.   Castaneda, 430 U.S. at 494.

Plaintiffs assert in their Complaints and motion papers that the selection procedures themselves are not racially neutral.   Relying on Castaneda v. Partida, 430 U.S. 482 (1977) and Alexander v. Louisiana, 405 U.S. 625 (1972), plaintiffs argue that the racial designation on the Fourth Judicial District juror qualification questionnaire provides a clear and easy opportunity for racial discrimination.

However, plaintiffs presented to the Court no evidence to support these claims and arguments.[21]

Defendants, on the other hand, presented facts to show that the process in the Fourth Judicial District for selecting those persons to summon for jury duty, determining there prospective jurors' qualifications for jury service, deciding their requests for excusal from or deferral of jury service, and forming the petit and grand jury panels, is performed randomly and without the benefit of the race information provided by a potential juror in the juror qualification questionnaire. In this regard, defendants established:

- The list of prospective jurors, obtained from a merged list of the Minnesota voter registration list, the Minnesota drivers' license list, and the Minnesota identification list, does not include the race of any persons.  Lahd Aff. ¶ 7; 2d Lahd Aff. ¶ 4.

- The grounds for disqualifying a summoned prospective juror are objective and do not include the race information found in Section B of the juror qualification questionnaire.  Rather, the grounds are based solely on information provided by the summoned prospective juror in Section A of the juror qualification questionnaire. Lahd Aff. ¶9.

- A summoned prospective juror is excused from jury service only if the person requests to be excused and the person satisfies the impairment or hardship grounds for excusal set forth in Minn. Gen. R. Prac. 810(b).  Lahd Aff. ¶9.  Further, as to those individuals who do request to be excused from jury service, the Fourth Judicial District Jury Division does not have access to the race of the vast majority of these prospective jurors, as most

---

[21]    Plaintiffs' reliance on <u>Castaneda v. Partida</u>, 430 U.S. 482 (1977) and <u>Alexander v. Louisiana</u>, 405 U.S. 625 (1972), cases in which the United States Supreme Court found equal protection violations in the jury selection process, is misplaced.  In both cases, the jury commissioners selected people from the community for jury service based on subjective determinations of their qualifications and with knowledge of their race.  Here, no such procedure is used.

of these requests are made without the prospective juror having returned a qualification questionnaire.  Id.

- Deferrals of jury service in the Fourth Judicial District are granted only at the request of the summoned prospective juror and are not allowed at all for grand jury service.  Lahd Aff. ¶¶ 9, 11.  A prospective juror is automatically granted an initial deferral of petit jury service for up to six months.  Lahd Aff. ¶ 9.

- Petit jury panels are formed by the designated number of names being randomly selected by computer from the weekly petit jury pool, and grand juries are formed by random computer selection of names form the list of the summoned prospective grand jurors who have completed the juror qualification questionnaire, but who have not been disqualified or excused from service, and who report for duty on the assigned date.  Lahd Aff. ¶ 10, 12.

It is only at the time of an actual jury trial that the demographic profile (including race) obtained from Section B of the juror qualification questionnaire is given to the presiding judge and the attorneys for the parties in a case.  Lahd Aff. ¶10.  However, at that point, the judge, attorneys, and parties have the opportunity to see each potential juror and observe their race, and thus, the race information from the questionnaire no longer plays a role in the selection or rejection of a particular juror.

Based on all of this evidence, this Court finds that requesting potential jurors to identify their race though the juror qualification questionnaire has not rendered the jury-selection process in the Fourth Judicial District susceptible of abuse or caused it to be racially biased. [22]  This is because while the information

---

[22]     Defendants argued that the completion of the Minnesota juror qualification questionnaire item requesting prospective jurors to identify their race is voluntary and therefore, the questionnaire item does not deny plaintiffs equal consideration for jury service because they do not have to provide the information.  In this regard, defendants stated that jurors are free to decline to complete the race item

is theoretically available for use (or misuse), the evidence presented to this Court

confirms that it was not utilized at any point throughout the formation and

selection processes used for petit and grand juries.   Instead the evidence shows

that the Fourth Judicial District relies on a facially neutral source lists and a

random selection process.   See United States v. Brown, 128 F. Supp.2d 1034,

1039 (E.D. Mich. 2001).   Based on this showing, this Court concludes that

plaintiffs have failed to establish the third element of an equal protection claim of

---

on the questionnaire, and that refusal to provide that information will not affect
their ability to serve on a jury.  Lahd Aff. ¶ 5.  While this Court accepts that it is
the interpretation and practice of the Jury Division for the Fourth Judicial District
to treat Section B of the questionnaire as voluntary (Lahd Aff. ¶ 5), there is
nothing in the questionnaire that informs a potential juror that they are not
required to fill out any part of the form, much less Section B.  In this regard, the
Court rejects defendants' suggestion that "the questionnaire itself states that the
questions in Section B are asked 'to ensure efficient management of our jury
system' and that the questions in Section A are those which are asked 'to
determine your qualifications for jury duty.'"  Defs.' Mem., at 5, citing Lahd Aff.
Exs. B, C.  The questionnaire informs the reader:

> Court Rules require that we ask the following questions A) to
> determine your qualifications for jury duty and B) to ensure efficient
> management of our jury system.  Minnesota Statute § 593.40, Subd
> 4. states that anyone failing to return a jury questionnaire pursuant
> to the Court's order without good cause is guilty of a misdemeanor.

Defendants are correct that this language refers to "A" and "B"—however, there
is no way the reader can tell that those letters mean Sections A and B, much less
that Section B need not be answered.   Nevertheless, whether Section B is
mandatory or voluntary, the fact is that at the end of the day, plaintiffs have not
established that the information garnered from Section  B is used to preclude
African Americans from serving on grand or petit juries.  In this regard, the Court
notes that since 1972, the federal Jury Selection and Service Act ("JSSA") has
required prospective jurors to provide race information and no court has found
held that the federal juror selection process is unconstitutional.  See 28 U.S.C. §§
1864(a), 1869(h); see also Pub. L. 92-437 (amending 28 U.S.C. § 1869(h)).  Like
the federal court, the Fourth Judicial District Court seeks information regarding
race solely to enforce nondiscrimination in jury selection.  See Lahd Aff. ¶ 5; 28
U.S.C. § 1869(h).

systematic racial exclusion from jury service—that the jury-selection process is susceptible of abuse or is not racially neutral.

Therefore, based on the facts presented by defendants and the lack of evidence presented by plaintiffs, the Court recommends that defendants' motion for summary judgment be granted and plaintiffs' motions for summary judgment be denied.

## **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein, **IT IS RECOMMENDED THAT**:

1.  Plaintiff John Miles, Sr.'s (Civil No. 04-4072) Motion for Summary Judgment [Docket No. 16] be DENIED.

2.  Defendants' (Civil No. 04-4072) [Docket No. 38] Motion for Summary Judgment be GRANTED.

3.  Plaintiff Robin Perkins's (Civil No. 04-4111) Motion for Summary Judgment [Docket No. 18] be DENIED.

4.  Defendants' (Civil No. 04-4111) Motion for Summary Judgment [Docket No. 32] be GRANTED.

5.  Plaintiff Ardella Mckenzie's (Civil No. 04-4133) Motion for Summary Judgment [Docket No. 19] be DENIED.

6.  Defendants' (Civil No. 04-4133) Motion for Summary Judgment [Docket No. 29] be GRANTED.

7.  Plaintiffs' suits be DISMISSED WITH PREJUDICE.

Dated:        August 5, 2005

*s/ Janie S. Mayeron*

JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **August 23, 2005** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **August 23, 2005**.